Good morning and may it please the court, my name is Matthew Robinson on behalf of the Mr. Warren, as you know, your honors, was working as an independent contractor on behalf of the Watts Law Firm. And the Watts Law Firm, and Michael Watts, the lead defendant in this case, was intent on getting their piece of the action from the BP oil spill and the fund that was set up to compensate those harmed from the spill. Through mass torts litigation. Mr. Warren was one of the few defendants convicted, one of two defendants convicted in this case. And there are several reasons that I see that Mr. Warren was convicted, and I believe convicted unfairly. And I believe it was as a result of a fundamentally unfair proceeding. Let me ask this, because I do think the standard review may make a difference in this case. Mr. Warren never filed for a severance, even though Ms. Lee did. Would that then be a waiver instead of a forfeiture? Because it's clear, it's not like some attorney didn't remember to make an objection and forgot about it, and then, oops, realizes it later on appeal. Here, he was aware of the need to move for a severance. The judge told him to move for a severance, and he didn't move for a severance. Should we deem that a waiver? I don't believe that's a waiver. And even if it is a waiver, I think it would satisfy the standard for this court to take it upon its ability to correct the error that occurred. Well, if it's waived, we can't do that. If it's forfeited, we can, but if it's waived, it's not. Why is it not waived? Well, it's not waived because, one, it was brought up throughout the trial. It was clear that the judge was put on notice that there was an issue with respect to the joint trial proceeding against these defendants, particularly with respect to Mr. Warren and Ms. Lee. Now, I can't get away from the fact that counsel did not join Ms. Lee's objection and request. And doesn't that mean, as Judge Haynes says, it was this option of severance was out there because Lee's counsel made it. And so your client and his attorney very well may have made a strategic choice that we're better off being tried together, and that's really not a bad strategy because, in my experience in these multi-defendant fraud conspiracy cases, the, quote, lower-level defendants often want to be tried with the bigger defendants because they often can just go by the wayside. The government's focus is on the big guys. Now, in this trial, of course, it turned out the opposite result, that the little guys got convicted and the big guys didn't. But if that's a strategic choice your client made that he was better off being tried with the higher-level folks, why should he then be able to challenge that in this court? Well, in terms of strategic choice, first of all, what you're saying, Your Honor, is well taken. However, in this instance, a strategic choice, you just cannot look at this and say this was a strategic choice to remain silent when each of the co-defendants are laying blame squarely on Gregory Warren for the crime. No, it's not strategy. Why didn't he say, why didn't counsel say, I agree with Ms. Lee? We want a severance too. I can only speculate on that, Your Honor, and I don't know if you want my speculation. I wasn't at court. Well, please offer us something other than the strategy. My speculation is that Mike Watts was a powerful attorney from a powerful law firm. He was running this case as the lead attorney even though he was pro se. And the counsel that was representing Mr. Warren was going along with what all the big guys were doing. And essentially, I cannot imagine standing through a trial where my co-defendants are over and over again during 25 days of trial pointing their finger at my client. And I will tell you I have seen plenty of cases where there's three or four different defendants or plaintiffs represented by different lawyers and somebody will come up with a good idea and everybody else will go, well, I joined in that because that's easy to do. You don't have to go do the research, write the document, think. All you have to do is go, I agree. So it wouldn't have been very hard to do. And the judge even said, you will need to file one so I can rule on it. And so it wasn't like the judge was saying, you better not file a motion like that or I'm going to sanction you. It was like, you need to do that. So I think there's a problem there, but I do want to ask you something else, so I'm going to move on because I think you've answered as best you can. How many days of actual testimony took place before the first motion was filed? The motion for severance? Yes. I'm not sure because it was Ms. Lee's counsel that filed that. I believe it was several days went by before the first motion was filed, but it started during opening statements from each of the defense counsel, the laying blame on Mr. Warren for the entire crime and additional crimes. And so that's when his notice began that the tactic that Warren was going to follow. Well, I mean you wish he had made the motion. Okay. So let me move on and let's assume arguendo. The very best standard review you could get is plain error, so let's assume arguendo that applies because then it goes to my next question. Okay. The idea of plain error is that there's an error, and I'm going to spot you prong one that there's an error. Let's just say that. But then how can we say it's clear? Can you point me to a case of anything even remotely similar where we reversed a district court for failure to grant a severance in a situation even remotely analogous? Well, the cases are cited in the brief. I believe it's the Johnson case and the Kaufman case, Romanello and Johnson. Each of those are on point with this issue in terms of the unfair proceedings that occurred with respect to changing or laying blame on Mr. Warren. Those are both before the Supreme Court's decision in Zaffaro, right? Yes. Do you have any post-Zaffaro precedent from any other courts of appeals even? I have not found any, Your Honor. And with that— What about on the variance issue? Is there a case where we reversed based upon a failure to sever due to variance from the indictment? Well, the variance issues are also abounding. I don't have a case specifically other than what's cited in the brief where it was reversed based on variance. But I think it's the accumulation of these errors. We have a variance issue, and it's not a variance that the government produced. It's a variance that the co-defendants produced. Doesn't that make it unique in a sort of— It does. —in a plain error in that a problem? Because to me, the theory of plain error is it should have been obvious to the judge. But it's not just that one error, Your Honor. It's the error with respect to the fatal variance in the charges. There's the error with respect to Michael Watson's. This is critical. He was able to provide testimonial evidence and statements directly to the jury in the guise of arguments from counsel because he was the defendant. The confrontation clause. So there's a confrontation clause issue as well. Mr. Warren was never able to— But following up on the obviousness point, can you cite any cases saying that it's a confrontation clause issue when a pro se co-defendant is making statements, that that's testimonial? Again, it seems to be a matter of first impression as far as I can tell. That's a problem. That's a problem. Was there any objection made to the argument that Watson made? Or did counsel say, Judge, I object to this. He's testifying. Not from Mr. Warren's counsel. It was all from Ms. Lee's counsel. Okay. Thank you. You've reserved time for rebuttal. Thank you. This is one of those cases I could have spent an afternoon on back when I was a trial judge. All right. Mr. Weber for Ms. Lee. Good morning. May it please the Court. Over the course of the five-week trial, there was specific, substantial specific and compelling prejudice against Christy Lee. And this was primarily due to the attacks of her co-defendants, Michael Watts, David Watts, and Eloy Guerra. Let's call them the Watts camp. Judge Costa, to answer your question, yes, at the beginning of the trial, the plan, the strategy was Ms. Lee is the lowest person or one of the very lowest person. And the government is here to prosecute Michael Watts. The government is not spending time and money to prosecute Christy Lee. And it became very obvious from voir dire where Michael Watts said I was robbed, I was frauded, or any of you jurors frauded. And so that set off the red flags in my mind because I was the trial judge that we have a severance issue. We have a problem that has arisen.  Yes. Yes. Yes, Your Honor. Well, so let me ask you, would you really be better off then with a separate trial in which only, let's say, these two defendants are at issue? Because then the government is coming at you 100%, whereas in this trial the government was going after the big plaintiff's lawyer. Absolutely, Your Honor. It became very apparent that the bulk of the prosecution against Christy Lee was driven by co-defendants Michael Watts, David Watts, and Eloy Guerra. If you look in our brief, the specific examples, sites of time and time again, beginning with oral argument, opening statements, excuse me, David Watts, record, page 545 to 546. The Watts camp got scammed out of $10 million by Christy Lee. The Watts camp was misled by Christy Lee. Eloy Guerra's lawyer, very, very good, very talented former prosecutor's record, page 614 to 615. We, Eloy Guerra's team, will prove who committed this fraud, and it will be overwhelmingly clear that Christy Lee committed this fraud. The fraud started with Christy Lee, and that's record, page 622. And Judge Davis, to answer your earlier question, our motion, our first motion for severance was filed seven days after the start of the trial. And so the trial started on a Monday, and that motion, our motion, was brought to the attention and put the court on notice that we have an issue here that needs to be addressed. Was it the following Monday, or was it seven days of trial? It was seven days, Your Honor. Seven real days. The trial started on July 18th of 2016. Our motion was filed on July 25th. And how many days of testimony had transpired?  But by that time, it was abundantly clear that from opening arguments, of course that's not testimony and that's not evidence, but now we have real witnesses that are being used by co-defendants to attack Christy Lee. And that's what Ruminella says. And although it's – What's the best – I've read the examples you gave. Most of them, the lawyer is asking a question, well, didn't Ms. Lee do this or that? But then the witness usually says, well, no, or I don't know. So given that the questions of counsel aren't evidence, I understand clearly counsel is trying to redirect the focus and the blame on Ms. Lee. But what actual evidence can you tell me – what's the best example you have or the best two examples of evidence that came out through the co-defendants that was prejudicial to your client? Sure. So Christy Lee – our defense was verification of these identifications. Christy Lee was in a position to verify these people and get their identification information correct. The Watts camp did the exact opposite, the mutually exclusive, antagonistic defense attacking Christy Lee. And they – not only did they defend themselves. They attacked Christy Lee, and that's what they did. And so when it became time – And what evidence was brought out by them that would not have been brought out if you were tried alone? Sure. That was evidence through witnesses of Dr. Hassel, the expert that came up with the percentage that 99.07 percent of the Watts database is correct – no, excuse me. 99.07 percent of the identifications came from Christy Lee. And so we know that in this body of identifications that it all came from Christy Lee. And every mistake in this information is Christy Lee. Then their next witness was Dr. McGuinn, who came up with an algorithm of some sort and said there's a statistically probable – probability that the names were made up. In his opinion, put on by the co-defendants, that these names and these identifications were made up. Wasn't that obvious? Wasn't there overwhelming testimony that some of these supposed clients, some of them were deceased, a number of them didn't know anything about authorizing claims being filed on their behalf, their socials were wrong? There was that testimony and evidence. But when the evidence was wrong, when the information was wrong, our defense of verification of the identifications, that's why we were attempting to do what we were attempting to do. But everyone acknowledged – as I understand the trial, everyone had to acknowledge these clients were not real clients. So Watts is trying to push the blame down on your client and Mr. Warren. Your clients are trying to push the blame down even further. But no one was – I mean you can't dispute that these were deceased people's socials or the wrong socials. I mean that was – I didn't see any challenge to that. No, Your Honor. You can't dispute. And when you submitted 40,000 names, that there's not going to be a percentage of error. And you have to show good faith on the behalf of Ms. Lee in working to try to remedy the error. And while our defense was attempting to show the jury that that's what she was attempting to do, we had the Watts camp smashing that. Let me ask you this because it's not something that has been discussed, which is the standard review for Ms. Lee. Even if we spot you that you couldn't have known beforehand, and so filing the motion to sever was filed as soon as it could be, the motion to sever was based on the antagonistic defenses and didn't raise the variance point. So wouldn't the review of the variance question be for plain error rather than abuse of discretion? I think the issue seemed to dovetail. Because the court didn't grant the severance, it resulted in a variance. And I would agree that that wasn't raised at the lower court level. So what's the effect on the standard review for us? If, in fact, we spot you that the antagonistic defense was raised timely but we're less persuaded in light of recent precedents, what do we do with the variance argument? Do we treat that as plain error or how do we assess that? I think the court should find that because of the abuse of discretion regarding the denial of the severance motion, it resulted in prejudice to Kristi Lee, i.e., the variance, the compelling prejudice, which was the conviction. That's where I would respectfully request the court to go. And what would that be called? On the variance point, what would the standard review, what would we call that? I don't know. Okay. I don't know. But what my position is is that the variance, the jury verdict, resulted and is prejudice, is the prejudice to Ms. Lee that resulted on the court's failure to grant the severance. So if you assess it under plain error, you think you would still prevail. Is that what you're saying? I would still prevail under Ruminella when we look at the five factors or the guideposts that Ruminella put. I see my time's up. You can finish. Let me ask you one question. How do you deal with Zaffaro, Supreme Court's decision in Zaffaro? Zaffaro, Your Honor. I mean, as I read that case, it was a drug conspiracy case, and there was a question about knowledge of drugs in a box. And the defendant, Zaffaro, I guess, they all denied knowledge of what was in the box. And one of the defendants said Zaffaro owned the box. And Kess, you know, put on evidence that he was the one who knew about what was in the box. And the Supreme Court said severance was not required. The defenses were not logically inconsistent. This was not a case in which the prosecutor's own case in chief is marginal and the decisive evidence of guilt is left to be provided by a co-defendant. I mean, there's no question here about the sufficiency of the evidence on all the defendants, is there? I take Zaffaro. I read Zaffaro to say, look, if there's mutually antagonistic defenses, that's not a bright-line rule to grant a severance. But what Justice Stevens said in his concurrence is, and Zaffaro doesn't present this to our court, that when there is a case that there is mediocre prosecution and the prosecution, the bulk of the prosecution is by the co-defendants, then we have this issue that we have to address. And the Fifth Circuit has addressed that in Romanello, and here are our guideposts. I'm specifically looking at the core of Defendant Watts was to attack Christy Lee and to disprove Christy Lee. Judge Costa has a question, and then we'll need to let you go. All right. One more. So I want to ask about the variance. Judge Haynes asked about the standard of review. I want to ask about the theory, the underlying theory. A variance happens if the crime charged in the indictment is different than what's proved at trial. And tell me if I'm wrong, but I understand your theory to be she was charged with filing false claims, saying these people had claims against BP, but making up names, making up Social Security numbers to victimize BP in the whole claims process. But Watts gets in there and says, well, she was ripping me off because I paid $10 million for them to go beat the pavement and come up with real clients for me, and they didn't do the work, and they just took my money and spent it lavishly. So I was ripped off. But if the jury accepted that theory, it still required that they were making up the names, making up the socials. So wouldn't it also mean if they were doing that to take the money from Watt, they also were making up names that they knew were going to get submitted to BP, so they also would have known that BP was a victim? And if that's the case, how is there a variance? Because the fraud against Watt required them to submit false claims against BP as well. Well, that's the difficulty of making the argument for the variance is because you have this giant indictment, 100 pages at least, I believe, and the conspiracy alleges – I'll have to go back to the record excerpts and see how many individual overt acts are alleged. And so the government simply has to show, hey, we proved one of these things, and if we have one large conspiracy proven, although multiple conspiracies proven during the – one conspiracy alleged, but multiple conspiracies alleged during the course of the trial, I think our case law simply says that that's sufficient for the jury to come back and find guilt on that one giant conspiracy, and that's what happened in this case, unfortunately. And unfortunately, I think the conspiracy that they found was a conspiracy between – To defraud Watts. To defraud Watts, which was not the goal of the government. Well, as I said to your co-counsel, I definitely could argue this or hear this all afternoon, but we've got to let you go, and we've got to hear from Mr. Kennedy. Good morning. Greg Kennedy representing the government. May it please the court. To directly address the question that the court had earlier about the variance in Warren's motion to sever, you're exactly correct. That happened on the fifth day of actual trial that Lee filed a motion for severance. Warren never did file a motion for severance. So is that a waiver? It is a waiver. And he never filed it throughout the rest of the trial, brought it up for the first time on appeal, trying to bootstrap him. But if we were to grant Christy Lee, either on plain error review or abuse of discretion or some other standard, would it make sense to not do Warren? I mean, isn't that a little bit illogical that we say these two should have been severed, but this guy's lawyer screwed it up and hers didn't, and therefore we're going to give her the trial but not him? Does that make sense just logically? Maybe it does as a matter of standard review. I don't know. You tell me. That was the only thing that I was trying to get at is to distinguish between each of those defendants how the law would apply to them individually. But as a practical matter, even if you assigned a plain error review to him, you would find that there was no clear error here. This is a case that involves seven defendants, and as Judge Girola noted at the outset when Lee first brought up this motion, as is in the case many times, especially when this was involving potentially $2.3 billion, over 40,000 claimants in a BP oil spill, one of the largest natural disasters to hit the United States, that there might be some finger-pointing going on. So the timing of this motion was suspect. It's particularly suspect. Yeah, but, you know, Judge Costner pointed out she could have thought she was the little minnow and he's the big shark, and then all of a sudden the shark starts trying to eat the minnow, and that's just a different world than everybody just doing their own thing. It would be, except for the fact when you look at the opening statements made by the defendants. Christy Lee herself, through counsel, made an opening statement, which we all know is not evidence, but nonetheless pointed the finger at Michael Watts. This is at the very beginning of the trial, as their trial strategy was laid open, that they were relying in good faith on others, whether it be downstream to the field workers or upstream to Watts. Specifically, she said that she was relying on these mass tort experts to fix any deficiencies. So it was even clear from day one of trial that they were going to point fingers at each other, and she was one of the ones pointing a finger. Now, did BP actually get defrauded? Because it seemed to me that there was this big collection that got Michael Watts his seat at the table, but then when the forms were actually filed to recover, only the real people came forward, the handful of real people that there were. I mean, there weren't these fake Social Security people didn't collect it, they. Right. If I understand the question correctly, as the presentment forms were presented to BP, I don't know if there was a dollar figure ever transferred. That never came out at trial. BP, as it turned out, was not cooperating in this particular prosecution because apparently they had their own litigation involved in the Watts firm. But what is clear is Michael Watts circulated an email, which is government's exhibit 228, which clearly set forth for everybody, he says, and I'm paraphrasing here, but I do know he says eggshell, what do you think of our eggshell docket now? 2.3 billion dockets to BP. Don't require any proof, and basically we have no proof. And within that same email, speculating that the settlement could go as high as $3 billion. So whether or not he collected that money or not, he negotiated a settlement and used those numbers. So I guess my point was more directed to the point that Judge Costa raised towards the end about the variance because it seems to me that if Christy Lee is trying to get paid by Watts, she helps him simply by giving him a big pile of names so he becomes one of the big dogs at the table, regardless of whether BP ever pays a dime based on that. So isn't that, so then when Watts turns on her and says, I was paying you $10 million to give me real people as opposed to just help me look good, that is a little different from we were all in a conspiracy to make up people that BP would pay. That does sound different, so explain to me how that's not a variance. It is, and I don't believe the evidence showed nor did the government set out to prove at the very beginning that Michael Watts and his firm were going to send $10 million to Mississippi to generate a fake docket. I mean that would just defy any kind of logic. However, what happened was… That was how I understood your theory to be. But it was the circumstances that actually led to it because once they hired Eloy Guerra, who was the middleman between Warren, you've got to remember that Greg Warren had previously been indicted and convicted in the Southern District of Mississippi for putting together bad dockets in the FinFIN litigation, which the court is aware of. He had previously worked with Christy Lee and Michael Watts on the FEMA litigation, I believe that resulted from all this Katrina FEMA housing. So all of these parties knew each other, and they knew how to go about establishing a docket, and that's why they hired Christy Lee for her specific inroads into the Vietnamese community because she could speak it and she knew the folks there. They started off by getting names and Social Security numbers of potential claimants. What they found out very early on is through Eloy Guerra that they weren't adding up and they had bad names. They reported that to Watts. The evidence showed that Watts wanted this docket cleaned up. But here's where the problem came. The deadline started rolling on. They had to present these claims by a certain amount of time or they would lose these claims and wouldn't be able to protect these individuals. The entire time Christy Lee is telling them that they're going to get it fixed. Now bear in mind over $10 million has come into Mississippi through Mississippi Council and being paid to the coast, various amounts going between the players Warren and Lee. But in fact they never did fix them. So they sent the spreadsheets to Michael Watts, and ultimately at the end of the day, even if he didn't start out in the conspiracy to do it, he knew that the bundle of names were not proper, that they didn't have authorization to have this personal identifying information, yet he was the last person to be able to put these packets together, negotiate with BP, and in the email traffic when Ken Feinberg . . . Sounds like you're trying to argue why you should have been able to convict Watts. Well, right. Who is, going back to Judge Haynes' question, in the indictment, who was the victim? Was it BP or the entire claims process because Watts was going to get a seat at the steering committee that he didn't otherwise deserve because of this inflated number of claimants? It would have been BP in addition to this whole claims process. Right. That ultimately they were the ones that were going to be defrauded. But BP wasn't really victimized, was it? I mean, it didn't actually pay out money to fake claimants, at least I'm sure it did in general, but in this particular scheme I haven't really heard that. What I've heard is that it kind of all came crashing down when the claims had to be filed because they found out that of the tens of thousands there was maybe 700 real people. And as I say, there was no evidence. BP was not cooperating in the prosecution, so I don't know what, if any, they paid. All that we were left is is the representation of one of the defendants that he had, in fact, negotiated a $2.3 billion settlement on this eggshell plaintiff docket. But Lee knew the whole game was they needed claimants. Exactly right. And so she was convicted of creating fake claimants. That's right. So how's that different than what was alleged in the indictment, which was a scheme to create fake claimants so Watt could be at the head table of the steering committee? I believe I understand what you're saying there. There is no difference. In other words, what was alleged in the indictment was that there was a single conspiracy. Each of them had their own individual parts. But Lee's job, or part of that conspiracy, if you will, was to hire field workers, to obtain names and packets, to bundle them up and send them to Watts. So when Watts, and when we're talking about a variant saying, hey, you defrauded me in particular, she may have, in fact, been defrauding him. But at the end of the day – But that's really a different scheme than we're all in this to take out BP versus Lee is defrauding the guy that paid her $10 million. I mean, he paid her. He says to get real names. You guys say to get fake names. And so that's what the case became about, the $10 million he paid her, and they're spending it on cigars and all this kind of stuff, as opposed to this group of people trying to take on big old BP because of this terrible disaster. Maybe I ought to clarify. It's not that the indictment alleged that they started out to get bad names, if I'm understanding your question. The idea was that when they started this entire process, it was to be legitimate. However, they're being charged with using or improperly using the personal identifiers. Yeah, but it's who's zooming who. I mean, the defraud was this gang against BP. Right. Now it turned into a very powerful and well-known and very successful lawyer now comes in and joins hands with the government to take on the minnow, in essence. And you don't think that's a different case than her lawyer thought they were trying? It's not. There is a possibility. I mean, when you look at it, there's a lot of things that are going around, but it comes under the same umbrella in that Lee was providing the names to Watts. Watts used those names. Once they knew that those names were not authorized, that's when the criminal liability attached because they were in possession of these personal identifying information that they weren't supposed to have, using it to pursue a claim against BP. Additionally, or alongside of that, if, in fact, Lee was telling Watts, hey, send me more money, I'll work harder on this, it is true that she could have been trying to milk him for more money. But the overall conspiracy that the government charged and was shown in the indictment and the jury instructions was that collectively they conspired. But what did the jury believe, as we see from the verdict? The jury believed that Lee defrauded Watts. Not necessarily. Because the whole thing, the government's position, as you articulate it now, makes no sense with a not guilty for Watts because without Watts you can't have this conspiracy. I mean, Lee herself can't go file all these claims. She's not the lawyer. She's not the one, you know, the big dog at the table in terms of – and, again, I'm using these analogies. I don't mean to be disrespectful to people. They're all human beings, and I recognize that. But the point being, she is not the guy that can sit at the table and be the big lawyer, the big plaintiff's lawyer that's one of the group of the lead counsel and all that. So without Watts, she's nothing. And so your original theory is Watts is the kingpin and everybody else is just kind of part of the mix. But Watts's theory was he's this pristine guy who was brought down by this woman and Warren, and that's what the jury believed. And to me that just sounds different. Now, whether it's technically different as a matter of indictment law, we'll figure out. But it seems very different to me practically. Well, there's a number of things that aren't on the record that the jury observed. And so, of course, I'm not allowed or able to give that here that would show some very good reasons or prospects of why Watts's liability did not attach for a jury verdict. There were a number of things that were going on both inside and outside the courtroom that are not reflected on the record, but obviously very well could have appealed to the jury just as much as you're saying that Lee was convicted only because of Watts putting evidence on her. Because ultimately what the government showed was that she had knowledge. She knew. She was told 15 different ways that you had deceased clients. You're not supposed to be doing that. That is the government's evidence. Well, it's almost always easier to tie the people at the lower end who are out on the street dealing the drugs or in the fraud scenario, the accountants in a company who are actually fudging the books. I mean, there it's pretty hard to provide a defense. Just like here, it's pretty hard to provide a defense to collecting fake people's names and socials. But then the CEO of the company says, oh, I didn't know my accountants were doing those fudging numbers. Sometimes that defense works. Sometimes it doesn't. Here it worked for Watts. He could say, oh, I thought we were getting legitimate names that were legitimately making me someone on the steering committee. But, in fact, this woman and this guy, Warren and Lee, they were out there getting fake names unbeknownst to me. But does that change that they knew the names were going to be used by the claims process to get Watt on the committee? That was his goal, right? That's why he's paying $10 million. Well, your theory is that Lee and Warren, in getting these names and false names, their intent was to help defraud BP. And so that was their role in the conspiracy. That was the government's case. Yes, Your Honor. That's exactly right. And the government put on multiple witnesses. Everything from Chris DeLeon, who noted these discrepancies, who told Christy Lee about it, told her she needed to fix it. Ryan Willis, another government expert, not an expert but a witness, came on and testified that he utilized Densfree to check Social Security numbers and again told Lee that these were not correct and that you don't have accurate claims. But what about all these Watts experts? If they had been government experts, wouldn't she have been entitled to some advanced knowledge of them that she didn't get? They, I should say they, Lee and Warren, that they didn't get? If it had been a government witness putting forth an expert, yes. And so doesn't that also hurt the defense of Lee and Warren that all of a sudden they're just getting all this ammunition lobbed at them that they were not given notice of because it's not a government, they're not government witnesses? But then the government benefits from that in convicting them. Well, I think what's interesting about that is it's not one place on the record where you find that Lee or Warren objected to any one of these defense witnesses nor the testimony given. Well, I'm not sure that they would have a basis to object to a co-defendant bringing on evidence. The point is it gets back to this issue of the severance because had this been tried as just United States v. Lee and Warren, then you all would have had to bring these experts or not, and if you hadn't, maybe they wouldn't get convicted. But if you brought them, then you would have had to do proper disclosure and all of that. Well, the government's case did not rely on any of these experts. I mean, they did nothing to, and I understand the viewpoint that you could say that it piled on her, that it added something. But the government proving the elements of its case didn't need expert testimony. We didn't need somebody to tell the percentage that these were made-up numbers. We had a witness who testified that they met with Greg Warren who said, we know the docket is bad, we know we got names out of the phone book. We clearly interviewed witnesses who said, I never signed up as a client. So we don't need expert testimony to say what the percentage is of accurate versus not accurate or who handled them because we knew that Lee was in charge of the client development by hiring the field workers. It seems to me if you had 40,000 names or whatever the number was and a handful of them were improper numbers or names or whatever, I wouldn't find that shocking, but 97% is pretty shocking. Believe me. And when you're talking about intent and wrongdoing and whatever, I think you would expect in a long list of names, I mean, you wouldn't want that as a lawyer, and of course it would be unethical for me to allow that as a lawyer, but I'm saying it probably wouldn't have resulted in a prosecution, let's put it that way. But when most of the names are wrong, well then, so you don't think the experts that Watts called added anything to the case? Because basically all the witnesses we put on said that it was junk. Chris DeLeon said, I saw claimants from both Mississippi and Louisiana with the same signature. It looked like they were using different ink. It looked obvious. It appeared that they were trying to bogus up and generate these, and he testified about the method by which the field workers were paid by the packet, again bringing forth circumstantial evidence. Who paid them? Christy Lee did. She was in charge of the field workers, so there was plenty of evidence to show that she was the point person to generate this client base. She was the Vietnamese contact for this entire community. That's why they hired her. Without her, they would not have been able to generate it. What about Warren? He has no Vietnamese background. He had worked with Watts in the past on FEMA, but Warren, in fact, that's what Warren brought me. So why did he and Lee get convicted and no one else? I have no idea other than, again, like I said, there were some things that I believe that Watts wrapped himself. Well, again, that would have to be speculating on what Watts did with some of the jury and others. It was a very long trial, and again, this high corporate hierarchy, how much they actually saw, what they did, what they didn't. Ultimately, the jury believed. Because both Lee and Warren were at small fish in the overall scheme, right? Ultimately. I mean, they were at a similar level in that regard. They were. And ultimately, we believe the jury followed the instructions. Closer to the claimants, though. Correct. In time, in space, in span. Easier to tie to the claimant's recruitment. Absolutely. And that's why we believe that when the jury read the indictment, the proof, and then the jury instructions as instructed by the court, that they took a look at that. He said that each one of the defendants— I'm asking because you're running out of time about the loss amount for Warren. Right. His argument is that the court found, well, since the firm intended, the law firm intended this much loss, that that's attributable to Warren. And Warren says, no, you needed to show that more particular to me, I had this intent to defraud BP of this amount. So what's your response to that? I believe in a case like this, he would not necessarily know, ultimately, the amount at some point in time. But once they negotiated the $2.3 billion settlement, because that was always going to be up in the air, how much is this going to be worth? Because it depends on the individual claimants, whether they were a deckhand or a boat owner. So there were a lot of variables that went into it. But ultimately, when he sent that email out, about $2.3 billion, it was clear at that point he had a good idea. But the district court looked at that, too, and said, even if you didn't intend for the $2.3 billion, let's also try to make our best educated guess and take a look at the percentage of fraudulent claims based on the government's case. And we saw again, even there, they further reduced it. And then again, even on that amount, the court determined that that $550 million was only the threshold amount for that 30 base offenses. He argued the amount should be $37 million or what? I don't recall the exact amount. But he conceded he had some intended loss. Doesn't that show that he and the whole sentencing was based on intended loss to BP, even if it was discovered that these claims were false? That's exactly right. And BP didn't pay it out. I mean, the whole basis for sentencing and even Warren's concession, he argues about the amount, but he acknowledged there was some intended loss to BP itself. That is the key. As opposed to the actual loss, it's the intended loss that he was putting forward here. And the court sentenced him even below the guidelines, even taking all this into consideration. And when asked if he had anything else to submit on the damage issue, he had none. So this was the best the court could do in taking a look at the total amount. Okay. Thank you. Appreciate it. Mr. Robinson. Thank you, Your Honors. With respect to the loss, the court made an error in determining that Gregory Warren was responsible for the entire loss, subjective, excuse me, intended loss to BP. That without making a relevant conduct finding, without determining what was Mr. Warren's subjective intended loss in this case, assuming he was guilty, and obviously was at that point found guilty, so that was the error to be made. It was said that the court needs to find what was within the scope of his agreement within this conspiracy and what his subjective intended loss was to hold him responsible for the entire $2 billion, which essentially is what he did, the court did, because the court simply looked at the guidelines and found 550 is the top end of this, of the scale here, and it adds up to at least 550. Now, with respect to how did Mr. Warren get convicted when Mr. Watts didn't get convicted, it's very simple in my eyes, just looking at it objectively through the reading of the transcripts. The evidence against Mr. Warren was limited to he was in charge of hiring Miss Lee, who was in charge of hiring the field workers, or the workers in the field. He had an alleged affair with Miss Lee. I'm not sure if that happened or not. I'm not even sure if that should have been admitted, but that evidence was admitted through co-defendants. Warren stated in a post-offense conversation, a post-offense conversation to someone, that he realized they were just getting names out of phone books, so that was his knowledge of the offense. And the third one was he was living an extravagant lifestyle on the Watts law firm's dime, buying cigars, clothes, and cars, and having an affair. And with that, I will rest. Thank you very much, Your Honor. Thank you. Mr. Weber? Can you sum up for us your very best argument about why we should vacate, reverse a conviction, and send it back for another trial, where all this evidence can now come in through the government? Christy Lee got convicted by Michael Watts. The government did not convict Christy Lee. They've had a lot of evidence about him going around and collecting fictitious names. The government, in my closing, it's record page 4299. I point to specific evidence, specific documents, that show that a number of names, thousands of names, came to Michael Watts prior to Christy Lee was even hired, number one. The government just said they didn't rely on Watts' experts. That's not true. My brief, page 46, it's also important to remember the testimony of one of the defendant's expert witnesses. The information that was submitted back to them in Texas from Christy Lee had deceased taken off of there. That's record at 1672. If we look at Ruminello, if we look at those guideposts, each and every one is a checkmark as to co-defendants prosecuting Christy Lee. The core of the defense is the guilt of the co-defendant. That was the core of the defense of Michael Watts, David Watts, and Eloy Garrett. They disproved, they spent their entire case in chief disproving Christy Lee's defense, and that is that Christy Lee was verifying identifications. The Watts camp spent their time proving that Christy Lee generated identifications. And we look at defenses that are mutually exclusive. Irreconcilable, and that's what we have here. If the Watts people are saying you generated names, Christy Lee generated names, and Christy Lee's defense is I was using these tools, these private investigators, to verify this information. Co-defendants actually attacking the defendant at trial from day one for five weeks. Michael Watts, very powerful lawyer, very good lawyer. Chip Lewis, very, very good lawyer. Michael McCrone from Texas. Attacking, attacking, attacking. That's what they did. That was their defense, and it was successful. And there's compelling prejudice that resulted in the variance as evidenced by the verdict. Thank you. Thank you. We appreciate all of you.